THE STATE *vs.* ORRIN J. STOCKFORD ET AL.

Third Judicial District, New Haven, June Term, 1904.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

A conspiracy may be criminal either because its object or the means of its accomplishment are criminal in character.

A combination of workmen whose sole object is to procure from their respective employers a lawful contract which will enhance their wages and reduce their hours of labor is not criminal in its purpose; but if such combination contemplates the use of force, threats, or intimidation, to induce workmen to abandon the service of their employers, it becomes a criminal conspiracy not only because of the unlawful means which are to be used to effect its object, but because the purpose thus to be accomplished is by statute (§ 1296) made criminal.

The accused, who were officers and members of drivers' and teamsters' unions, were charged with having conspired to compel certain employers, against their will, to execute a particular contract respecting wages, hours of labor and other terms of service; and the

State v. Stockford.

means by which said conspiracy was to be accomplished were alleged to be (1) the placing of pickets near the employers' places of business, who would, by threats and intimidation, prevent persons from continuing in and from entering into the service of said employers, (2) by forcing the business customers of said employers, by threats and intimidation, to desist from dealing with them, and (3) by like means forcing all the members of labor unions to refrain from dealing with said employers and with every one who did deal with them. *Held* that the alleged methods of obtaining the execution of the desired contract were criminal.

A combination to compel persons, by threats and intimidation, to refrain from doing that which they have a legal right to do, is made criminal by force of § 1296 of the General Statutes.

A conspiracy to prevent an employer from carrying on his business, and to ruin and destroy it, is criminal both at common law and under the statute (§ 1296).

Any words or acts which are calculated and intended to cause an ordinary person to fear an injury to his person, business or property, are equivalent to threats.

The charge of the court in the present case reviewed and *held* to afford the accused no just cause of complaint.

Evidence of acts of the accused and their agents in furtherance of the object of the alleged conspiracy is admissible as tending to prove the manner in which it was designed to be accomplished.

After *prima facie* proof of the alleged conspiracy, evidence of the acts and declarations of the individual conspirators is admissible.

In the present case the State was allowed to show the number of customers lost by the employers since the strike, notwithstanding the objection of the accused that it did not appear how such customers were lost. *Held* that the cause of the loss of custom was one for the jury upon all the evidence in the case.

The State offered evidence that a workman of one of the employers, who had been insulted by a union man, was afterwards shot at while on duty. *Held* that evidence of the shooting was properly received, leaving the jury to determine whether the shots were fired by a union man.

One of the accused testified that he was president of the local union; that he assisted in drafting the proposed contract; and that he was present when the strike was ordered. *Held* that he might be asked on cross-examination if he did not understand that the purpose of the strike was to cripple the business of those employers who had refused to sign the contract, and if it was not his understanding that the purpose of his local union was to gain absolute control of all the teamsters in New Haven.

Another of the accused having testified that the union had instructed its pickets to use no violence, the State was permitted to show on cross-examination that the union had paid counsel to defend its

men who had been arrested for using violence. *Held* that the inquiry was proper.

One of the accused testified on cross-examination that he did not interfere with or insult a certain employee. *Held* that for the purpose of contradicting him he might then be asked if he was not the person who was convicted of a breach of the peace on such employee, the inquiry being accompanied with an offer of the State to lay in evidence the record of such conviction.

Submitted on briefs June 21st—decided August 12th, 1904.

PROSECUTION for conspiracy, brought to the Superior Court in New Haven County and tried to the jury before *Shumway, J.;* verdict and judgment of guilty, and appeal by the accused. *No error.*

The information contains six counts charging conspiracies to injure as many different parties, each of which is alleged to have been committed by the eight named defendants.

In the first three counts the defendants are described as being the officers, agents and members of an association or labor union known as "Local 340 of the Team Drivers' International Union," and in the remaining counts as the officers, agents and members of a labor union known as "Local No. 483, Carriage Drivers' Union of the City of New Haven, Connecticut."

The first count charges that said defendants and other unknown persons on the 18th of April, 1903, unlawfully and maliciously conspired and agreed together to compel the Peck & Bishop Company, a corporation located in New Haven and engaged there in the business of trucking, and employing a large number of teamsters who were members of said "Local 340," and the officers and agents of said Peck & Bishop Company, against their will, to execute and enter into the following agreement with said association and the members thereof: —

"AGREEMENT BETWEEN THE MASTER TEAMSTERS OF THE CITY OF NEW HAVEN AND VICINITY AND THE MEMBERS OF LOCAL 340 OF THE TEAM DRIVERS' INTERNATIONAL UNION.

"Article I. Party of the first part agrees to employ as

teamsters none but members of Local 340, or those who are willing to become members at the next regular meeting. Article II. It is further agreed that no objections shall exist on the part of the employees to the conditions of this contract for a stipulated time from date herein named. Article III. Each and every member of Local 340 shall be treated in a fair and impartial manner, and shall suffer no persecution because of his union principles, or affiliation with organized labor. Article IV. This Local shall at all times have at heart the interest and welfare of its employers' business, and every member is expected to acquit himself in an honorable and straightforward manner, leaving as little as possible for criticism. Article V. If any employer becomes dissatisfied with the services of any member of this Local, such member shall be given a chance to hear charges by employer, and shall be heard in his own behalf before dismissal; and any member found guilty of violating this agreement shall be fined, suspended, or expelled from Local 340, according to the option of the Local. Article VI. Ten hours to constitute a day's work. Article VII. All members driving one horse shall receive not less than $10.50 per week, six days to constitute a week's work. Two horse drivers shall receive not less than $12 per week, six days to constitute a week's work. Four horse drivers to receive not less than $13.50 per week, six days to constitute a week's work. All members to receive time and one-half for all over-time. Article VIII. Under no circumstances will any member of Local 340 work July 4, Labor Day, or Christmas, unless absolutely necessary. Teams to be taken care of on such days free of charge, if necessary. If members of Local 340 work on said holidays they shall receive double time for same. Article IX. This agreement to remain in effect for the term of one year from the 1st day of May, 1903, unless altered by the consent of both parties affected.

"_____For Local 340."

It is further alleged in the first count, that as a part of said conspiracy the defendants agreed together upon the

following unlawful methods and means by which to accomplish said purpose of the conspiracy : (1) that the defendants and their unknown associates would cause, induce and persuade all the employees of the Peck & Bishop Company to strike, and leave the employment of said company ; (2) that they would place pickets near the places of business of said company, who would by threats and intimidation prevent persons from continuing or entering into the employment of said company ; (3) that they would threaten and intimidate the business customers of said company and force and compel them to give up all business relations with said company ; (4) that they would by threats, intimidation and persuasion compel the members of said association, and of other associations and labor unions, to refrain from employing said company and from employing or trading with those who employed said company ; (5) that they would prevent said company from carrying on its said business and would ruin and destroy the business and property of said company ; and that in pursuance of said conspiracy the defendants and their said associates performed said acts so agreed upon as the methods of accomplishing the purpose of said conspiracy.

The remaining five counts are similar to the first count, excepting that the names, the Smedley Company of New Haven, and Sheldon L. Squier of New Haven, appear in the second and third counts, respectively, in place of the Peck & Bishop Company in the first count, and that the names of Martin C. Swaner, Frank N. Palmer, and James L. Nesbit, each described as of New Haven, and as engaged in the livery business, etc., and employing for that purpose a large number of workmen who were members of " Local 483," appear in the fourth, fifth and sixth counts respectively, in the place of the Peck & Bishop Company mentioned in the first count ; and with the further exception that the agreement described in the fourth, fifth and sixth counts, alleged to have been required to be executed by the liverymen, did not contain articles two and eight of the agreement above set forth to be executed by the team owners, and con-

tained different provisions as to the time required for a day's or week's work and as to the wages to be paid.

It appears from the finding that the State offered evidence tending to prove all these allegations, and to show that the team owners described in the first three counts, and liverymen described in the last three counts, having refused to sign said agreements, the acts described in the information as the methods and means adopted to accomplish the purpose of the alleged conspiracy were performed and carried out by the defendants and their associates; and that the defendants offered evidence to show that said allegations were not true, and that neither they nor other officers or members of the union ever instructed any pickets to in any way interfere with the employees of said team owners and liverymen, or to use any threats, intimidations or violent methods, but instructed them that, without using any violence or stopping them from their work, they might persuade nonunion men to join the union.

The State having offered evidence that the defendants and other members of the unions had, after the commencement of the strike, endeavored by threats to prevent customers from further patronizing said team owners and liverymen, one Norton, an employee of the Peck & Bishop Company and familiar with its business, and one Donnelly, secretary of the Smedley Company, were permitted to testify as to the number of customers lost by said companies, respectively, after the strike, against the objection of the defendants that it did not appear how said customers were lost.

Alfred Coolman, a teamster of the Peck & Bishop Company, testified that he ceased work the first week of the strike and then resumed work; that afterwards he saw twenty-five or thirty teamsters wearing the union button, some of whom insulted and threatened him; that on one occasion a crowd of twenty or more teamsters hooted and yelled at him as he was driving a team of the Peck & Bishop Company, and three of them, who wore the union button, stopped him and talked of " pulling him off the wagon and smashing him," and told him they would get even with him; that on another

occasion, while the witness was driving a wagon for said company, one Taylor, a teamster, who, it had been shown, belonged to the union and had worked for the Peck & Bishop Company, and had, on one other occasion at least, interfered with the teams of the company, said to the witness: " If I had you out of the wagon here I would break your bloody head, and I will do it yet "; that one night while the witness was acting as a watchman for the Peck & Bishop Company, about a week after said remark of Taylor, some one shot at him, and that " he felt the wind of it," and one of the bullets struck a wire on a bale of hay against which the witness was leaning. This testimony was received against the objection of the defendants that the shooting had not been connected with any union man.

William Talmadge, one of the defendants, having testified, on behalf of the defendants, that he was president of Local 340 and assisted in preparing the form of said agreement, that he was business agent of the union and presided at its meetings, and that the men were instructed not to interfere with or annoy any one, was asked on cross-examination, after he had testified that he was present at the meeting when the strike was ordered, if he did not understand that the purpose of calling out the men employed ·by those concerns and individuals who had refused to sign the agreement, was to cripple them in their business. The witness answered: " I knew that if they didn't sign that agreement the men would be called out. That was the object of calling the men out, naturally." This evidence was admitted against the defendants' objection that it was immaterial and improper and called for the witness's construction of an act of the union. The same witness was asked whether it was not the purpose, as he understood it, that his branch of the union should be in absolute control of all the teamsters employed in New Haven. He answered that he could not state they controlled them all. The defendants' general objection to this question and answer was overruled.

Peter Flynn, one of the defendants, having testified in behalf of the defendants that he was secretary of Local 340,

that he appointed pickets and instructed them as to their duties, and that they should use no violence, and that they were so instructed at the meetings of the union, but that instances of violence had come to the knowledge of himself and other officers of the union, and having testified on cross-examination that as secretary he had employed counsel to defend men who had been arrested for using violence, was asked on cross-examination who paid such counsel. The witness answered, " The union." Defendants' objection to said question and answer were overruled by the court.

The defendant Cornelius testified upon direct examination as to instructions given to union men to use no violence, and, on cross-examination, that he had no knowledge of any one interfering with one Joseph Kinney by insulting or abusive language or otherwise, excepting as he had read of it, and that he did not so interfere with him and insult him. He was thereupon asked by the State's Attorney if he was not the person convicted in the Court of Common Pleas of having, on the 17th of May, 1903, committed a breach of the peace in New Haven streets upon said Kinney. In connection with this inquiry the State offered the record of such conviction, the defendants having before objected to the question whether the witness had been convicted of using violence during the strike, upon the ground that the record was the best evidence. The court admitted said inquiry against the defendants' objection.

Among other things the defendants requested the court, in substance, to charge the jury that the defendants and other members of the unions had a legal right to strike for the purpose of obtaining higher wages, although they may have known that by so doing the strike would injure the business of their employers ; that there was nothing unlawful in the agreements presented to the team owners and liverymen for signature, and that upon their refusal to sign it, the accused had the right to stop work and request all others to stop work until some satisfactory arrangement should be made as to wages and hours of labor ; that members of a union had a right to trade with whom they pleased,

and to solicit members of other unions and others to give their patronage to union men and those friendly to them, and to cease to give their trade and patronage to others; and that an agreement among members of a union to solicit patronage and trade to be so given, as a means of inducing employers whose union men had struck to make satisfactory terms as to rate of wages and hours of labor, was not unlawful and did not constitute an unlawful combination; that members of a union had the right to refuse to work with non-union men, and to combine to establish a rule not to work with them, and that the refusal of union men, in pursuance of such a rule, and not with malicious intent to injure the business of another, to so work, was not unlawful; that the sending out of pickets, after the strike, not in sufficient numbers to overawe or intimidate employees, and without instructions to use violence but to persuade workmen to join the union, and join in the strike for the purpose of obtaining what the union deemed to be sufficient wages, and a combination to so employ pickets for that purpose, were not unlawful.

*E. P. Arvine*, *Edward J. Maher* and *James M. Sullivan*, for the appellants (the accused).

*William H. Williams*, State's Attorney, and *Alfred N. Wheeler*, Assistant State's Attorney, for the appellee (the State).

HALL, J. The information alleges a combination of the defendants and others; the purpose to be effected by the combination; the acts by which that purpose was to be accomplished; and the performance of such acts. The allegations as to these subjects are the same in the several counts, excepting that two different agreements were presented to be executed, and that they were to be signed by different parties. By these allegations but a single offense is described in each count, namely, a criminal combination to procure a certain agreement to be signed by certain described methods.

A combination of persons for the accomplishment of a particular object may be criminal, either because the object itself is criminal in its character, or because the means by which that object is to be effected are criminal. *State* v. *Gannon*, 75 Conn. 206, 210.

The agreements which the defendants sought to have signed contain no provisions which are contrary to the criminal law of this State, and if the only purpose of the combination was to procure these agreements to be entered into in order to advance the legitimate interests of the employees of the team owners and liverymen, without the view of injuring the business and property of their employers, such purpose was not criminal.

If the alleged purpose of the combination was not criminal, were the methods to be pursued criminal? It is alleged that the defendants maliciously conspired to compel the employers to sign the agreements. It is not alleged that it was intended to directly threaten the employers to induce them to sign the agreements, nor does it appear that they were directly threatened. The information states how they were to be compelled—and we think it is in effect alleged that they were to be compelled only by the particular methods described in the information—the first of which is by inducing the workmen, by concerted action, to strike and leave the employment of the employers named. Such a strike may be lawful, or it may be unlawful and criminal. Whether it is lawful or not depends upon its object and the manner in which it is conducted. A combination to cause a strike for the purpose of injuring and destroying the business and property of· another, or of depriving another of his liberty or property without just cause, is both unlawful and criminal. 1 Eddy on Combinations, § 521 *et seq.; Old Dominion S. S. Co.* v. *McKenna*, 30 Fed. Rep. 48; *Arthur* v. *Oakes*, 63 id. 310; *Plant* v. *Woods*, 176 Mass. 492, 498; *State* v. *Stewart*, 59 Vt. 273, 289; *State ex rel. Durnet* v. *Huegin*, 110 Wis. 189; *Doremus* v. *Hennessy*, 176 Ill. 608; *State* v. *Glidden*, 55 Conn. 46, 71. A combination which contemplates the use of force, threats, or intimidation, to in-

duce workmen to abandon together the service of their employers, is criminal (authorities above cited), and a combination for that purpose is also criminal because it is to induce the commission of an offense which is made criminal by statute.

Workmen may lawfully combine to accomplish their withdrawal in a body from the service of their employers, for the purpose of obtaining an advance in wages, a reduction of the hours of labor, or any other legitimate advantage, even though they may know that such action will necessarily cause injury to the business of their employers, provided such abandonment of work is not in violation of any continuing contract, and is conducted in a lawful manner and not under such circumstances as to wantonly or maliciously inflict injury to person or property. 1 Eddy on Combinations, § 521; *Rogers* v. *Evarts*, 17 N. Y. Supp. 264; *Farmers Loan & Trust Co.* v. *Northern Pacific R. Co.*, 60 Fed. Rep. 803.

A combination to use the second, third and fourth alleged methods of obtaining the execution of the agreements is a combination to compel workmen and others, by threats and intimidation, to refrain from doing that which they have a legal right to do, and is criminal. The use of such means is made a criminal offense by § 1296 of the General Statutes, which provides that " every person who shall threaten, or use any means to intimidate any person to compel such person, against his will, to do or abstain from doing any act which such person has a legal right to do, or shall persistently follow such person in a disorderly manner, or injure, or threaten to injure, his property, with intent to intimidate him, shall be fined not more than one hundred dollars, or imprisoned not more than six months."

A combination to use the fifth alleged means, by preventing such employers from carrying on business and ruining and destroying their business and property, is equally criminal both at common law (see authorities above cited) and under the statute quoted.

The language or conduct which will constitute the unlawful use of threats or means to intimidate, need not be such

as to induce a fear of personal injury. Any words or acts which are calculated and intended to cause an ordinary person to fear an injury to his person, business or property, are equivalent to threats. *State* v. *Donaldson*, 32 N. J. L. 151; *Barr* v. *Essex Trades Council*, 53 N. J. Eq. 101; *Crump* v. *Commonwealth*, 84 Va. 927; *Rogers* v. *Evarts*, 17 N. Y. Supp. 264; *O'Neil* v. *Behanna*, 182 Pa. St. 236.

Upon the trial of the present case the contest appears to have been upon questions of fact rather than of law; upon the question of whether violence, threats and intimidation were the means used and directed by the defendants to be used, rather than whether proof of those facts was necessary in order to convict. The evidence is not before us, but the record shows that witnesses testified that pickets were instructed in open meetings by several of the defendants to use violence to prevent workmen from continuing in the employ of the team owners and liverymen, and that such instructions were obeyed.

The court instructed the jury that the information charged a criminal conspiracy, and properly defined that offense in the language of the opinion in *State* v. *Gannon*, 75 Conn. 206; that the right of the defendants and others to strike or leave the service of their employer singly or in a body, even though they believed that the result of such action would be to bring the business of their employer's temporarily to an end, and the right to meet together and counsel such action, were unquestionable; that if the only purpose of the strike was to procure better pay or shorter hours, the purpose was a lawful one, but that the defendants had no right to combine to accomplish such purpose by means of a crime; that if the real purpose of the strike was to ruin the employers' business by threats and intimidation, it was unlawful, and that a conspiracy for that purpose was a crime; that the stationing of pickets for the purpose of obtaining information as to the extent of the business of the person whom the picket was directed to watch, was not unlawful; that it might be lawful to attempt to induce another to leave his employer's service by fair arguments, and, also, perhaps,

to station pickets to ascertain how such persons might be reached and lawful means employed to induce them to leave their employers' service; that it was the right of members of these unions and other drivers to refuse to drive their carriages at any time, and was lawful for the defendants to solicit the business which was being done by said team owners and liverymen, and to induce their customers by fair means to employ the defendants and their friends; but that a combination to do these things by threats and intimidation was a criminal combination, and that the placing of pickets to induce one to leave his employer's service by threats and intimidation was unlawful; but that the defendants should not be convicted for what some one else had done, but only for what they had themselves done; that the words "threat" and "intimidation" had their ordinary meaning in the statute, and that for the purposes of this case a threat was a menace of such nature as to unsettle the mind of the person upon whom it operated.

Upon an examination of the entire charge we are satisfied that the defendants have no just cause of complaint, either upon the ground that the court failed to instruct the jury sufficiently fully upon the subjects embraced in their requests, or to fairly and properly present the case to the jury.

Evidence of acts of the accused and of their agents in endeavoring to accomplish the purpose of the conspiracy was admissible as evidence of the manner in which it was designed to be accomplished; and after *prima facie* proof of the alleged conspiracy, evidence of the acts and declarations of the individual conspirators was admissible. *State* v. *Thompson*, 69 Conn. 720, 726.

The testimony of the witnesses Norton and Donnelly was properly admitted. To render their testimony admissible the State was not required to first prove by direct evidence that the customers referred to had been solicited, by the defendants or their associates, to refrain from giving their patronage to the team owners. Whether the losses of custom were occasioned by such alleged acts were questions for the jury upon all the evidence.

For similar reasons the testimony of Coolman, that he was shot at, was admissible. The question was one of the weight and effect of his testimony in connection with the circumstances proved, as showing that the shooting was by a union man. The facts testified to were sufficient to warrant the court in leaving that question to the jury.

The questions asked the defendant Talmadge were proper in cross-examining him upon his testimony as to the purpose of the strike and the manner in which it was to be conducted.

The defendant Flynn having testified that the union instructed pickets to use no violence, it was proper cross-examination for the State to show the action of the union, when informed that violence had been used by their men; and, for that purpose, to show that the union had paid counsel to defend union men arrested for using violence.

The question asked the defendant Cornelius, in connection with the offer of the record of his conviction, was not for the purpose of proving the averments of the information, but to contradict, upon cross-examination, a material statement of one of the defendants' witnesses. It was clearly admissible for that purpose.

Other rulings complained of in the reasons of appeal require no discussion.

There is no error.

In this opinion the other judges concurred.