LAUGHTER v. UNITED STATES. LAUGHTER et al. v. SAME. RIVALTO v. SAME. ANDERSON v. SAME.

(Circuit Court of Appeals, Sixth Circuit. January 17, 1919.)

Nos. 3150, 3185, 3212, 3221.

1. INTOXICATING LIQUORS ☞132—TRANSPORTATION OF LIQUOR IN INTERSTATE COMMERCE—PROHIBITION STATE.

To render the Reed Amendment (Act March 3, 1917, § 5 [Comp. St. 1918, §§ 8739a, 10387a–10387c]), prohibiting the transportation of liquor in interstate commerce, except for certain purposes, into any state "the laws of which prohibit the manufacture or sale therein," of liquors for beverage purposes, applicable to a state, it must have adopted a general policy of prohibition throughout its territory; but it is not essential that such prohibition should be literally without exception.

2. INTOXICATING LIQUORS ☞132—TRANSPORTATION OF LIQUOR IN INTERSTATE COMMERCE—PROHIBITION STATE.

Under various statutes of Tennessee, taken together, both the sale and the manufacture of liquor for sale as a beverage are prohibited throughout the state, and the transportation of liquor into the state for beverage purposes is in violation of the Reed Amendment (Comp. St. 1918, §§ 8739a, 10387a–10387c).

3. CONSPIRACY ☞28—CONSPIRACY TO VIOLATE REED AMENDMENT.

There may be a conspiracy to violate the Reed Amendment (Comp. St. 1918, §§ 8739a, 10387a–10387c) by transporting liquor into a prohibition state, indictable under Criminal Code, § 37 (Comp. St. § 10201).

4. CRIMINAL LAW ☞395—EVIDENCE—PAPERS TAKEN FROM ACCUSED.

It was not error to admit in evidence against a defendant papers taken from his pocket after his arrest, where their return had not been requested.

5. CONSPIRACY ☞37—CRIMINAL RESPONSIBILITY—MERGER IN SUBSTANTIVE OFFENSE.

To create such relation, between a conspiracy and the substantive offense which was its purpose, as ought to prevent a double prosecution, there must be a complete identity between those acts which are the overt acts essential to make the conspiracy punishable and those acts which are necessary to make out the substantive offense.

6. CRIMINAL LAW ☞1165(1)—SEARCHES AND SEIZURES ☞5—HARMLESS ERROR—PAPERS SEIZED FROM DEFENDANT—RIGHT TO RETURN.

Denial of a motion by defendant for the return of papers taken from his pocket after arrest *held* error, but without prejudice; the only one admitted in evidence being cumulative upon a point fully established otherwise.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Criminal prosecutions by the United States against E. A. Laughter, against E. A. Laughter and W. Newton Fisher, against Alphonso Rivalto, and against A. L. Anderson. Judgment of conviction in each case, and defendants bring error. Affirmed.

Certiorari denied 249 U. S. 613, 39 Sup. Ct. 388, 63 L. Ed. ——.

Charles M. Bryan, of Memphis, Tenn., for plaintiffs in error Laughter and Fisher.

Frank S. Elgin, of Memphis, Tenn., for plaintiffs in error Anderson and Rivalto.

Wm. D. Kyser, U. S. Atty., of Memphis, Tenn.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. These four cases involve a common question, whether the Reed Amendment is applicable to Tennessee, and each case presents further specific questions. The latter are of such minor relative importance that the four cases may well be disposed of by one opinion. It is not necessary to state facts, except as to the specific questions.

The so-called Reed Amendment was inserted in, and became a part of section 5 of the Post Office Appropriation Act of March 3, 1917, c. 162, 39 Stat. 1069 (Comp. St. 1918, § 8739a). It reads as follows:

"Whoever shall order, purchase or cause intoxicating liquors to be transported in interstate commerce, except for scientific, sacramental, medicinal, and mechanical purposes, into any state or territory, the laws of which state or territory prohibit the manufacture or sale therein of intoxicating liquors for beverage purposes, shall be punished as aforesaid: Provided," etc.

The precise question then is: Do the laws of Tennessee "prohibit the manufacture or sale therein of intoxicating liquors for beverage purposes"? The first controversy arises over the meaning and effect of the disjunctive in the phrase "manufacture or sale." Is it intended to refer to a state the laws of which either prohibit the manufacture or prohibit the sale, or only to a state the laws of which both prohibit the manufacture and prohibit the sale? The language chosen presents, but does not solve, this ambiguity; nor do we find any necessarily controlling interpretation flowing from the reasons which may be supposed to have moved Congress to the passage of the law. We do not think it necessary in this case to decide whether a state which prohibited the manufacture, but permitted sale, or a state which forbade sale, but allowed manufacture, would be within the scope of the act. For the purposes of this opinion, we assume that the act is not applicable unless by the law of the state neither manufacture nor sale is permitted.

[1] A question is next raised as to the meaning of "prohibit." Does this refer to a local and limited, or only to a general and universal, prohibition? We are strongly inclined to the view that Congress did not intend to extend the aid of this act, except to those states which had adopted a general policy of prohibition throughout their territorial

limits; and, without expressly so deciding, we give the benefit of the doubt to the persons indicted, and assume that the state prohibitory laws must have a broad and general application. However, there is neither in the language of the act, nor in the reasons which caused its passage, any ground for requiring that the prohibition of manufacture and of sale should be literally without exception. A substantial covering of the whole territory and of the whole subject is the utmost that can be required, and any merely trifling and inconsiderable omission of area or of acts from the otherwise universal law must be regarded as negligible for the purposes of this inquiry.

[2] Coming to the Tennessee laws: Section 1 of chapter 1 of the Acts of 1909, provides:

"That it shall not hereafter be lawful for any person to sell or tipple any intoxicating liquors, including wine, ale, and beer, as a beverage, within four miles of a schoolhouse, public or private, where school is kept, whether the school be then in session or not, in this state."

We cannot doubt that the great part of the state of Tennessee is within four miles from some schoolhouse; but just how far we might take judicial notice in that direction is made immaterial by the fact that the Supreme Court of Tennessee has declared what this situation is. In Motlow v. State, 125 Tenn. 547, 560, 145 S. W. 177, 180 (L. R. A. 1916F, 177), that court said, in speaking of a later act of 1909:

"At the time the act was passed, the situation in Tennessee was this: Sundry statutes had been passed, known as 'four-mile laws,' which had made it unlawful to sell intoxicating liquors as a beverage anywhere in the state within four miles of a schoolhouse, whether the school was in session at the date of the sale or not. These acts made it unlawful to sell intoxicating liquors anywhere in this state as a beverage, since there was no point that was not within four miles of a schoolhouse."

There is nothing in the case of Cheatham v. Patterson, 125 Tenn. 437, 145 S. W. 159, Ann. Cas. 1913C, 314, inconsistent with this declaration that the sale of liquor as a beverage is prohibited throughout Tennessee. The statement in the latter opinion that not all sales of intoxicating liquors are unlawful sufficiently rests upon the adjudged exemption of sales for nonbeverage purposes.

There is a further statute upon the subject of sales: By chapter 3, § 1, of the Acts of 1917, it was declared to be unlawful—

"for any person, firm or corporation to have or keep in stock, in any warehouse or place of business or other place within the state of Tennessee, any intoxicating liquors, including wine, ale or beer, intended for present or future sale as a beverage, either wholesale or retail, and whether intended to be sold for delivery at the place of sale or to be shipped or otherwise transported for delivery at another place."

Obviously there can be no substantial sales, unless the person selling may have on hand, at some place within the state, the liquor to be sold. Putting together the four-mile law and this law against keeping on hand for sale, we cannot doubt that the laws of Tennessee virtually prohibit the selling of liquor for beverage purposes.

Manufacturing for sale is expressly forbidden by section 1 of chapter 10 of the Acts of 1909. This provides:

"That it shall not hereafter be lawful for any person or persons to manufacture in this state, for purposes of sale any intoxicating liquor, including all vinous, spirituous, or malt liquors: * * * Provided," etc.

It may be said that this leaves untouched the right of a citizen of Tennessee to manufacture for his own use. So it does; but, in view of the further restrictions, this right is brought nearly to the vanishing point. Section 4 of chapter 12 of the Acts of 1917 makes it unlawful—

"for any person to personally transport into this state or from one point to another within this state, even when intended for personal use, intoxicating liquors, including wine, ale and beer, in any quantity whatever."

The net result of all these statutes is that liquor cannot be sold within the state or be manufactured within the state for sale, and that while one may manufacture for personal use, he may not move it in any quantity or for any purpose away from the place of manufacture. Under these conditions, we are clear that there is, for the purposes of the question before us, sufficiently complete prohibition, throughout Tennessee, both of manufacture and of sale of liquor for beverage purposes. It follows that whoever brings liquor into the state in interstate commerce and for beverage purposes offends against the Reed Amendment.

[3] In the Laughter Case, No. 3185, Laughter and several others were indicted for violation of section 37 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [Comp. St. § 10201]), in that they conspired to violate the Reed Amendment by bringing liquor into Tennessee, and the writ of error is brought by Laughter against a conviction upon this indictment. His counsel urges that the Reed Amendment contemplates the necessary co-operation of two or more persons in order to make out an offense—in other words, that the statute is directed only against a conspiracy—and, upon this claim, bases the contention that only the substantive offense may be punished, and that indictment for conspiracy will not lie. The principle involved is said to be that declared for this court by Judge Lurton in Chadwick v. U. S., 141 Fed. 225, 236, 72 C. C. A. 343, 354, quoting from Wharton's Criminal Law:

"When to the idea of an offense plurality of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a character as that it is aggravated by a plurality of agents, cannot be maintained."

It may well be that, under the facts of the instant case, there was no violation of the Reed Amendment, except by those transactions which carried out the conspiracy, and that, under those facts, the conspiracy and the substantive offense ought not to be separately punished; but no question of double prosecution or punishment is presented in this case. The contention is the broad and general one that there can be no such thing as an indictment for conspiracy under this act. In that broad form, the contention is not good. The act plainly includes mere transportation, which may be the individual act of one person without any concert with others, and, in such cases, there is abundant room for additional and precedent conspiracy with others. In a very similar

situation, we have recently held that it cannot be declared as matter of law that conspiracy and substantive offense may not have separate existence and be subject to separate prosecution. Kelly v. United States, 258 Fed. 392, —— C. C. A. ——, opinion filed January 7, 1919.

It is said that there is no proof of the formation of any conspiracy within the district, as alleged in the indictment; that the only overt acts pleaded occurred outside of the district, and evidence of overt acts within the district was not admissible; and hence that the venue failed. The evidence tended to show that the liquor was loaded upon a boat further up the Mississippi, on the Arkansas side, by a man who then was, or recently had been, in partnership with Laughter in the liquor business, and that, when it arrived near Memphis, in the night and at a remote place, Laughter was present to meet it and to receive the liquor. The jury was entitled to infer from the facts proved that Laughter was the directing spirit of the enterprise, and had arranged in advance as to when and how the liquor should be sent, and had, in some manner, sent instructions to the place of loading. All this would naturally have been done in and from the Western district of Tennessee, where Laughter lived and had remained. There was ample justification for the conclusion that the conspiracy had been formed in this district. The instruction to the jury on the subject was not as clear and distinct as it might have been, but there is no sufficient ground to think the jury misunderstood.

Robinson, also named in the indictment as a conspirator, made a statement, after the arrests, and this was received in evidence against him, but with a warning to the jury that it was not against Laughter. The court did not, as requested, include in his final charge an instruction that this evidence must not be considered against Laughter; but it was not error to fail to repeat a warning recently given. Without regard to this Robinson statement, there were facts enough pointing to Laughter's guilt easily to support the verdict.

[4] Certain papers, taken from Laughter's pocket by the marshal when Laughter was arrested, were used in evidence against him. It may be that he was entitled to have these papers returned to him (Weeks v. U. S., 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177), but until he had asked for such return it was not erroneous to receive them in evidence (Adams v. N. Y., 192 U. S. 585, 595, 24 Sup. Ct. 372, 48 L. Ed. 575).

In case No. 3212, Laughter and his Arkansas partner, Fisher, were convicted of the substantive offense to which the conspiracy, involved in case No. 3185, related. Both respondents complain. Counsel for Fisher urge that the court, in effect, gave peremptory instructions against him. Fisher himself testified that he arranged for loading the whisky on the boat, and, in so doing, supposed he was acting in the interest of, or at the desire of, Laughter. There is, therefore, not the slightest doubt, on Fisher's own statement, that he did participate in causing this liquor to be transported into Tennessee. His only substantial defense is that he did not know it was going to Tennessee. There could be nothing prejudicial in the instruction that Fisher violated the statute if he did what he said he did, unless there was, in that

connection, a failure to make sufficiently clear to the jury that Fisher would not be guilty unless he knew of the Tennessee destination. While some parts of the charge are open to criticism on this score, yet we are satisfied there was no prejudice therefrom. At the end of the charge, Fisher's counsel brought this matter to the attention of the trial court, who thereupon said to the jury:

"If you believe from the evidence that the defendant Fisher had no knowledge, at the time of the acts detailed by him in the evidence, of the destination of the liquor, then he did not commit any offense under the said Reed Amendment, and your verdict should be one of not guilty."

It is true that this instruction did not, as it should have done, expressly require the jury to find that Fisher had knowledge of the destination, rather than to make his lack of knowledge a condition of acquittal. In strict construction, and taken alone, this seems to overlook the matters of burden of proof and of reasonable doubt; but there already had been full instructions upon these subjects, and, under the facts of this case, to find, as the jury did, that the proofs failed to show Fisher's lack of knowledge is hardly distinguishable from finding that he did have knowledge. The difference is not substantial enough to justify reversal.

[5] In this case, No. 3212, Laughter insists that he has been twice punished for the same offense, and thus raises, in another aspect, the proposition that the conspiracy and the substantive offense cannot be separately prosecuted. The general unsoundness of this claim has already been discussed. So far as there may be in any case a relation between the two which ought to prevent a double prosecution, it will be only in those cases where there is complete identity between those acts which are the overt acts essential to make the conspiracy punishable and those acts which are necessary to make out the substantive offense. That complete identity does not here exist. The actual taking of the liquor from the river boat onto the shore was alone sufficient to constitute participation in interstate transportation and to justify conviction of the substantive offense; but this act was neither pleaded as one of the overt acts in the conspiracy case, nor was it essential to make out guilt of the conspiracy. The utmost effect of such similarity as here existed in the proofs relied upon to show the two offenses was to advise the discretion of the court in imposing the second sentence; it cannot support any claim of error.

[6] Just at the opening of the trial, in No. 3212, which occurred some three months after the trial and conviction in No. 3185, Laughter made a motion asking that the papers taken from his pocket, by the marshal at the time of his arrest, be returned to him. The motion was denied and exception taken. We are compelled to think that this action was erroneous, under the rule in Weeks v. U. S., supra. That the petition for return of the papers was very informal and indefinite in its description, and that it was made so shortly before trial, and that the papers, instead of being in the manual possession of the district attorney, had become a part of the record evidence filed in the former case, do not constitute sufficient grounds for denying the petition. There seems to have been no doubt regarding the papers to which the

petition intended to refer. The delay in presenting the petition was immaterial, and there would have been no difficulty in getting the papers from the files to be returned. However, we cannot see that any substantial prejudice resulted. The only one of the seized papers, which was put in evidence or in any way used in this case, was a bill of lading which tended to identify the whisky which Laughter was receiving from the river boat as the same whisky which theretofore had been at the loading point in Arkansas. As an item of evidence against Laughter, it was so far merely cumulative that it is not reasonably to be supposed its reception in evidence could have had any substantial influence upon the verdict. Fisher, as a witness for respondents, had fully identified the whisky named in the bill of lading as that which he assisted in loading upon the river boat, and that the whisky, of which Laughter was found in control, had just been taken from the same river boat, was stated by Laughter and was clear beyond any reasonable doubt. In the Weeks Case, the lottery tickets, taken from Weeks' possession and put in evidence, seem to have been an important, if not essential, part of the case made against him.

In the Anderson Case, No. 3150, the only substantial point sought to be made, in addition to the inapplicability of the Reed Amendment to Tennessee, is that Anderson was not carrying the liquor "in interstate commerce," but that it was a part of his personal baggage, intended for his personal use, and having no connection with any contemplated commercial transaction. A defense of this kind has been held sufficient (U. S. v. Mitchell [D. C.] 245 Fed. 601), and the precise question seems now to be awaiting decision by the Supreme Court in United States v. Hill (No. 357, October Term, 1918) 248 U. S. 420, 39 Sup. Ct. 143, 63 L. Ed. 337. It is not raised by this record. The liquor in question consisted of some 20 quarts, packed in excelsior, in a small trunk. It does not appear there was anything else in the trunk. The jury had as much right to suppose that it was brought in for sale as for personal consumption. There was no request to charge, or exception to the charge, which saves the question now urged.

In the Rivalto Case, No. 3221, the further specific objection is that there was no evidence to justify conviction. We think the circumstances sufficiently point to the conclusion that Rivalto participated in ordering or transporting or causing the transportation of a quantity of liquor which might have been for purposes of resale and which was taken from an interstate train on its arrival in Memphis. The only plausible objection to the sufficiency of proof is that this train had traveled for more than 100 miles and made several stops after it entered the state of Tennessee, and that there is nothing to show that the liquor was on board before the train came into the state. The train had come directly through from Cairo, Ill., where liquor could lawfully be bought. For it to have been purchased and loaded upon the train in Tennessee would necessarily have involved violation of the Tennessee laws, and to assume Tennessee origin would be to presume that at least one, and probably several offenses against Tennessee laws had been committed. The liquor was in bottles which bore labels pur-

porting to show that it had been recently bottled for some dealer in Cairo. These labels were received in evidence without objection. The combined force of these circumstances was enough to justify the jury in thinking that the journey which ended in Memphis began in Cairo.

In these four cases, there are 130 assignments of error. We think no one has been overlooked, but they do not require further specific attention. Some rulings on evidence which might be thought subject to criticism were not prejudicial, or were cured by other rulings or instructions; some requests to charge, which were denied, and which might have been given, were sufficiently covered by the general charge; other requests, which were refused, although appropriate enough in their general thought, were made subject to denial by reason of their uncertain or double form; some of the assignments which provoke attention have no exception to rest upon; those which challenge the sufficiency of the proofs to support the verdict overlook the fact that verdicts may rest upon rightful inferences as well as upon direct testimony; and others relate only to matters of discretion.

Each of the four judgments is affirmed.