STATE OF CONNECTICUT *v.* JOHN D. McLAUGHLIN ET AL.

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, Js.

Argued April 5—decided June 28, 1945.

*Alfonse C. Fasano,* with whom, on the brief, was *Fred Trotta,* for the appellants (defendants).

*Abraham S. Ullman,* state's attorney, with whom, on the brief, was *Arthur T. Gorman,* assistant state's attorney, for the appellee (state).

MALTBIE, C. J.   The state's attorney for New Haven County filed an information charging that nineteen persons named in it, at New Haven in New Haven County and at Bridgeport in Fairfield County, on or about August 1, 1940, and thereafter, conspired "together and with one George T. McKee, to lease, main-

tain and operate telegraph and telephone apparatus for the purpose of transmitting to New Haven and receiving at New Haven information concerning horse races upon which bets were to be placed," that in pursuance of the conspiracy a telegraph line was maintained between the two cities, that certain places equipped with suitable apparatus, books and devices were maintained for the purpose of transmitting and receiving such information, and that bets were made, recorded and registered, all contrary to the statute against conspiracy. General Statutes, Cum. Sup. 1939, § 1447e. The statute makes no change in the common-law crime of conspiracy which is material to the decision of this case. Five of the defendants pleaded not guilty, were tried by a jury, were found guilty and were sentenced by the court. Four of them, McLaughlin, Bangert, Celentano and Pacileo, have appealed. We shall refer to them as the defendants, and to the others charged with conspiracy in the information as the accused.

One assignment of error is the denial by the trial court of a motion to set the verdict aside. The jury might have found the following facts: McLaughlin was an employee of an organization known as the Sports Review Company and later as the Metropolitan News Service. The organization was engaged in the business of disseminating sport news, particularly that concerning horse racing, and it had an office at first in New York City and later in Elizabeth and Hoboken, New Jersey. McKee had been employed for many years by a concern which had been engaged in selling information on horse races, and at one time McLaughlin had been in the employ of the same concern. In 1940, McLaughlin met McKee, who was then unemployed, informed him that the Sports Review was going to extend its services to Bridgeport, and pro-

posed that he join the organization. McKee agreed, and they went to Bridgeport and there secured an office. McLaughlin paid the rent for the first month and at the beginning financed the office with his own funds; and he continued to have a general oversight of the service in Connecticut. Bangert actually managed the service, keeping the accounts in his own name. The name on the door of the office was "Novelty Advertising Company," the telephones were listed in the name of the Radio Programme, and the business was conducted under the name of the Seaboard News Company. Five or six subscribers to the service, men who were engaged in betting on horse races, were secured. McLaughlin introduced Bangert to McKee, with the statement that the former was the operator for the office and would conduct it. A wire of the Postal Telegraph Company was run from the office of the Sports Review in or near New York into the Bridgeport office, over which news came by telegraph. Bangert, who was a skilled telegrapher, received the information in telegraphic code and then relayed it to several subscribers to the service by speaking into telephones, one of which each subscriber had the right to keep open throughout any afternoon when there was horse racing anywhere in the country. Information was sent out only while or shortly before or after the racing was in progress, and it was particularly last-minute information of a type of great value to gamblers on horse races.

The business at Bridgeport was not making money; also, certain men in New Haven became somewhat troublesome to the Bridgeport subscribers by reason of telephoning them for information. McLaughlin, Bangert and McKee talked the matter over and, as New Haven looked like a good field, it was decided that McKee should go to New Haven to see if he could get

subscribers there. Certain persons were suggested as possible subscribers. At first it was thought that the payment of $25 a week by each subscriber would be sufficient to justify the maintenance of the service, but when the cost was estimated it was found that $40 a week would have to be charged, and this was the amount paid, except in one instance where, by special arrangement, $35 was accepted. It was also decided that there must be a minimum of four subscribers, and McKee "broadcast it around to everyone in New Haven" that it was necessary to have this number if the service was to be furnished. Four were secured and later two others were added. The method employed to extend the service to New Haven was by an agreement with the telegraph company to run a private wire from the Bridgeport office to New Haven, of a type which would carry the human voice and over which Bangert would speak as he did over the telephones in the Bridgeport office; each subscriber was connected with this wire by a "loop" and furnished with a headpiece which would enable him to hear the information coming over it. As in the case of the subscribers at Bridgeport, those at New Haven were men interested in betting on horse races. They were usually known in their relations with the service by fictitious names. Payment for the service was made at first to McKee, who, after deducting his weekly salary, delivered the balance to Bangert. Later, after McKee severed his connection with the organization, Bangert went to New Haven each week to make the collections. The sums due were paid in cash and slipped to the recipient very quietly when, at an agreed time, he would be on a public street near a certain restaurant or in it. The wire from Bridgeport to New Haven and the "loops" from it to the places where the subscribers received the information were installed, owned and

maintained by the telegraph company and the agreement with that company was made by persons representing the Sports Review organization in New York.

Among those who were discussed by McLaughlin, Bangert and McKee as possible subscribers at New Haven was Celentano. One of the first men there with whom McKee made contact was Frank Rulli, by whom Celentano was employed. McKee, about the time the wire from Bridgeport was installed, talked to Celentano about the service. Rulli became a subscriber. When later Rulli moved his place of business, Celentano took the service over, becoming himself a subscriber. Celentano's business was admittedly betting or advising others as to betting on horse races, and he took the service to aid him in it. He rented an office under the name of Joseph Clark. Desiring to have two telephones installed, he arranged with the janitor of the building, who was also a photographer, to make application for them and have them listed under the designations "Color Portrait" and "Photographers Portrait." For a time Celentano gave up the service and these telephones were removed. Later he again became a subscriber. He then caused Pacileo, owner of a restaurant in New Haven, to apply for telephones for him, which Pacileo did, having three instruments installed and listed in his name, with the addition of the words "photography business." By means of these telephones, Celentano at times talked with other subscribers in New Haven, although their telephones were listed in fictitious names or unlisted. Pacileo was a friend of Celentano's and a frequent visitor at his place of business. He must have known that Celentano was using the service for betting purposes. When Celentano heard of the first arrest in this case, he burned various papers connected with betting in his place of business. He also cut the "loop" which

connected with the wire from Bridgeport to New Haven, removing the portion extending from the roof of the building to his office. At that time Pacileo was with him. Pacileo, when being questioned after his arrest, denied any connection with Celentano's business, and stated that he had no part in securing the telephone for him and was not present when he cut the wire. When asked on the witness stand why he lied about these matters, he admitted that it was because he did not want to get into trouble.

From these facts the jury could not well conclude otherwise than that McLaughlin and Bangert conspired with McKee and others to maintain and operate telegraph and telephone apparatus for the purpose of transmitting information concerning horse racing upon which bets were to be placed. The defendants Celentano and Pacileo claim, however, that upon the evidence summarized above the jury could not reasonably find that they participated in any joint endeavor with McKee and the others to accomplish an unlawful purpose, that Celentano did no more than purchase the service, and that Pacileo was party, at most, to Celentano's business of betting on horse races, which would not bring him within the scope of the information. There is, it is true, little direct evidence connecting Celentano with any conspiracy to accomplish the purposes stated in the information, but there is much to support inferences by the jury which they might regard as proving Celentano's guilt beyond a reasonable doubt. He was one of the first of the New Haven group with whom McKee discussed the extension of the service to that city; and, in view of the fact that that extension could only be made if there were at least four subscribers and that the price was increased from $25 a week to $40 because this was necessary to make the project financially possible, the jury

could well infer that Celentano knew the true situation and, specifically, knew that the service would be brought and maintained in New Haven only if there were a certain number of subscribers, and that he joined with the others in subscribing for it with this in mind. Such an inference would be strengthened by the clandestine way in which Celentano made use of the service, by the method used in payment for it, in the same way and at the same time and place as the other subscribers, by his telephonic communications with other subscribers, despite their fictitious names and unlisted telephones, and by his efforts to prevent the tracing of the wire to his room by cutting it at the roof and removing the connecting section.

From Pacileo's contacts with Celentano's use of the service, his assistance to Celentano in getting the telephones, his presence when Celentano cut and disposed of the wire, and his admission that he lied to the police to avoid trouble, the jury could also properly find that he was associated with Celentano in the latter's betting business and participated in the plan to carry on the service, with knowledge of the combination among the defendants to procure information for the several subscribers at New Haven by the method used. One who comes into a conspiracy after it has been formed, with knowledge of its existence and with a purpose of forwarding its designs, is as guilty as though he had participated in its original formation. *Thomas* v. *United States,* 156 Fed. 897, 912, 84 C.C.A. 477. The jury could properly find that there was on the part of all the defendants an intentional participation in the transaction or some portion of it with a view to the furtherance of a common criminal purpose or design. *United States* v. *Falcone,* 109 Fed. (2d) 579, 581; *State* v. *Rich,* 129 Conn. 537, 540, 29 Atl. (2d) 771; *Lefco* v. *United States,* 74 Fed. (2d) 66, 68.

The main reliance of the defendants is upon two principles of law which they contend are applicable to the facts that the jury might have found proven. In prohibiting under a penalty certain conduct which necessarily involves the participation of two or more persons, the legislature will sometimes provide that only one of them shall be punished; *In re Cooper*, 162 Cal. 81, 84, 121 Pac. 318; thus we held that, while the illegal sale of liquor necessarily requires both a seller and a buyer, the legislature intended to impose punishment only upon the seller. *State* v. *Teahan*, 50 Conn. 92, 100. In such situations, the participant who does not come within the scope of the penalty imposed cannot, through the medium of a charge of conspiracy to commit the crime, be held guilty, if he participated no further than was necessary to the accomplishment of the offense. *Gebardi* v. *United States*, 287 U. S. 112, 119, 53 Sup. Ct. 35. Otherwise, he would be subjected to punishment by means of the charge of conspiracy when the legislature did not intend that he should be penalized. If, however, he does acts in material furtherance of the crime which go beyond such participation as, in the contemplation of the legislature, was involved in its accomplishment, he may bring himself within the scope of a charge of conspiracy. *United States* v. *Holte*, 236 U. S. 140, 144, 35 Sup. Ct. 271; *Gebardi* v. *United States*, supra, 120; *Becher* v. *United States*, 5 Fed. (2d) 45, 50.

The defendants contend that the information charged them with a conspiracy to violate § 6344 of the General Statutes, the material portion of which is as follows: "Any person, whether acting for himself or as agent or servant, who shall sell, lease, lend or give to the owner of any pool room, or to the servant or agent of any such owner, or who shall install or operate in any room or building, any telegraph, telephone or

ticker instrument or machine, or other similar apparatus, with knowledge or intent that such instrument, machine or apparatus is to be used for receiving, transmitting or recording bets or wagers, or for receiving, transmitting or recording the name of any horse or jockey participating in horse-racing upon which bets are or are to be placed . . . shall be fined not more than five hundred dollars or imprisoned not more than one year or both." The language of the information does not bring the charge strictly within the statute and the state claims that it charged a conspiracy "to commit an unlawful act which the spirit if not the letter of the statute served to characterize as inimical to the public interests." *State* v. *Kemp*, 126 Conn. 60, 81, 9 Atl. (2d) 63. To meet the defendants' claim we will, however, assume that the information did charge a conspiracy to violate § 6344 and that the legislature by that statute intended to punish only those who transmitted and not those who received the information described in it. The facts we have stated above, if found by the jury, would amply justify them in concluding that Celentano was not in the situation of one who merely subscribed for and received the information but was an active participant in bringing about the accomplishment of the scheme to procure it for the New Haven subscribers; and this would suffice to take the case out of the principle invoked by the defendants.

The other principle upon which the defendants rely is that, where the participation of two persons is necessary to the accomplishment of a particular offense and both parties to it are subject to a penalty, they cannot be charged with a conspiracy to commit it. *United States* v. *Katz*, 271 U. S. 354, 355, 46 Sup. Ct. 513; *United States* v. *Dietrich*, 126 Fed. 664, 667; *United States* v. *Sager*, 49 Fed. (2d) 725, 727; *People* v. *Pur-*

*cell,* 304 Ill. App. 215, 218, 26 N. E. (2d) 153. The reason of the rule is that, where the legislature has, by particular provision, made certain misconduct a crime, the courts may not, on facts falling within the description of that crime, hold that the misconduct constituted another and different offense within the general language of another statute. *United States* v. *New York C. & H. R. R. Co.,* 146 Fed. 298, 303; *United States* v. *Kissel,* 173 Fed. 823, 828; *Ex parte O'Leary,* 53 Fed. (2d) 956, 957. The principle has its limitations akin to those we have been discussing. See *United States* v. *Katz,* supra; *People* v. *Purcell,* supra. It has no application in this case. Section 6344 purports to provide punishment only for one who furnishes the information, and the recipient is not within its scope. *Chadwick* v. *United States,* 141 Fed. 225, 236, 72 C. C. A. 343; *McKnight* v. *United States,* 252 Fed. 687, 689, 164 C. C. A. 527; *Vannata* v. *United States,* 289 Fed. 424, 427; *Lisansky* v. *United States,* 31 Fed. (2d) 846, 850. Also, in so far as the information alleges that the defendants conspired to maintain and operate telegraph and telephone apparatus for the purpose stated, the offense might be complete even though no one received the information; *United States* v. *Shevlin,* 212 Fed. 343, 344; *United States* v. *Burke,* 221 Fed. 1014, 1015; *State ex rel. Durner* v. *Huegin,* 110 Wis. 189, 243, 85 N. W. 1046; and the fact that in other aspects of the statute a concert of action would be necessary is, after the general verdict of the jury and in the absence of any showing of prejudice to the defendants, immaterial. *Laughter* v. *United States,* 259 Fed. 94, 97, 170 C. C. A. 162; Practice Book, § 310. There is no merit to the contention of the defendants that, as the statute penalizes one who, "acting for himself or as agent or servant," does the prohibited acts, there is involved such an agreement as makes the prin-

ciple applicable. The purpose of the provision is to make one who does the prohibited acts personally guilty whether he is acting for himself or another; and, if a principal and his agents or employees conspire to violate the statute, each would do so in his individual capacity without regard to any agency or employment which might exist between them. See *Lisansky* v. *United States,* supra. There was no error in the denial of the motion to set the verdict aside.

The defendants filed motions addressed to the original information seeking more specific statements, and also a motion to expunge so much of it as alleged that the accused conspired in Bridgeport in Fairfield County. On June 16, 1943, the court filed memoranda of decision denying the motions. On June 21, 1943, the defendants filed further motions for a more specific statement. On June 22, 1943, the state's attorney, by permission of the court, filed a substitute information. On June 23, 1943, the court denied the last mentioned motions without memorandum. In this situation it is difficult to see how the rulings on these motions present any questions for our consideration, for the substituted information replaced the original and any rulings upon the motions addressed to the latter cannot be made the basis of a claim of error. *Antman* v. *Connecticut Light & Power Co.,* 117 Conn. 230, 234, 167 Atl. 715. However, the defendants in their brief claim that the denial of the motions for more specific statements was erroneous because the information did not state sufficient facts to enable them to prepare their defense, or to avail themselves of a plea of former acquittal or conviction, should a later charge growing out of the same matters be made, or to protect their rights upon an appeal, and in view of the nature of this contention we shall briefly notice it. ". . . in a charge of conspiracy the conspiracy is

the gist of the crime, and certainty, to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is requisite in stating the object of the conspiracy." *Williamson* v. *United States,* 207 U. S. 425, 447, 28 Sup. Ct. 163. In *State* v. *Pallotti,* 119 Conn. 70, 73, 174 Atl. 74, A-60 Rec. & Briefs, p. 5, we held that an information charging conspiracy in much the same terms as does the one before us was not open to attack on the grounds advanced here. See also *State* v. *Murphy,* 124 Conn. 554, 560, 1 Atl. (2d) 274. The voluminous record before us is ample evidence that the information was sufficient to enable the defendants to present to this court the errors they claimed were committed at the trial. On the ruling on the motion to expunge, it is sufficient to point out that in the defendants' brief the ground stated in the motion, upon the basis of which the trial court denied it, is admitted to be unsound; and we are not called upon to consider the reason in support of it first advanced in the brief. Practice Book, § 363.

The defendants' assignments of error in the charge are without merit. The argument in support of them is largely based upon a misconception of their fair import. If the portions in which occur the statements claimed to be erroneous are read in connection with the rest of the charge, it can readily be seen that they could not have misled the jury into believing that the mere taking of the service was sufficient to establish the guilt of any of the defendants. On the other hand, the court repeatedly and emphatically told the jury that the defendants could not be found guilty merely because they subscribed for the service, but only if they knew of the general plan on the part of the defendants as a group to bring that service to New Haven, and with that knowledge joined in the scheme

to procure the service to be furnished to others as well as to themselves. See *State* v. *Murphy*, supra, 565; *State* v. *Hayes*, 127 Conn. 543, 564, 18 Atl. (2d) 895. They admit in their brief that they cannot successfully complain of the failure to give most of their many requests to charge, unless their claims of law, which we have discussed, are correct, and, as we have overruled them, these requests require no further discussion. The court sufficiently, if briefly, complied with the requests to charge as to the effect upon the credit to be accorded a witness of wilful, false testimony and of contradictory statements made out of court.

No attempt will be made to review at length the very many rulings on evidence assigned as error. We shall disregard those not discussed in the brief, those where objections to questions were overruled but the finding fails to state what answers, if any, were given, those where the defendants' brief claims error upon different grounds than were stated when the rulings were made (Conn. App. Proc., p. 61), one where the objection was to a question whether one of the defendants had had a conversation with another person and, while an affirmative answer was given, no statement of the terms of the conversation appears, and one where the finding does not present sufficient facts upon which to review it. The trial court could in its discretion exclude questions as to the type of business done by McLaughlin and McKee when previously employed by the Annenberg concern, as too remote to the issues in this case. On the other hand, the information alleged that the conspiracy commenced on or about August 1, 1940; the way in which the business at Bridgeport was conducted before the wire was extended to New Haven was well within its scope; it was not claimed that, when evidence as to the matter was offered, a prima facie case of conspiracy had not been

proven; and the evidence was admissible as against all the accused. *State* v. *Stockford,* 77 Conn. 227, 239, 58 Atl. 769; *Cooke* v. *Weed,* 90 Conn. 544, 548, 97 Atl. 765; *Pepe Co., Inc.* v. *Apuzzo,* 98 Conn. 807, 814, 120 Atl. 681; 11 Am. Jur. 571.

Evidence as to articles found at the places of business of the different accused, indicative of the fact that information received over the wire was being used to further betting upon horse races, was properly admitted to prove the purpose of the conspiracy alleged in the information, and that some of these places of business were being conducted by those of the accused who were not on trial was no ground for excluding the evidence. See *Vannata* v. *United States,* supra. Evidence that one man whom McLaughlin instructed McKee to approach as a possible subscriber to the service was known to be a bookmaker was admissible upon the same ground. Clearly, it would be necessary for the subscribers, in order to make such a use of the service as would justify the amounts they paid for it, to have telephones; the securing of them could be found to be in furtherance of the conspiracy; and, in the absence of any claim that prima facie proof of the conspiracy had not been made when evidence as to the securing of telephones was offered, it was admissible against all of the defendants. If the state failed to offer evidence showing relevancy to the issues of some or even all of the telephone calls from the office of one of the accused who was tried with the defendants but did not appeal, the finding contains nothing to indicate that the admission of the evidence harmed the defendants. The cessation of the use of the wire upon the arrest of the accused was some evidence that it had been serving a purpose other than the lawful dissemination of news. As indicated by what we have said above, evidence that Bangert was an employee of

others was immaterial to the issues in the case. In the cross-examination of the defendant McKee, it was not error to exclude questions whether he had had anything to do with or assisted the subscribers for the service, since, in view of the testimony as to his participation in the transactions, the questions were ambiguous in their implications. Nor was it error to exclude a question asked Celentano embodying the terms used in the information and inquiring whether he had conspired with the other accused, involving, as it necessarily did, a conclusion upon the complicated issue of what constitutes such participation as to make one a conspirator. Evidence that various of the accused carried on their operations independently of one another would not be so material that its exclusion can be regarded as reversible error, requiring a new trial. Testimony of two defendants that they had never been arrested was not the proper way to prove their good character and was properly excluded. *Richmond* v. *Norwich,* 96 Conn. 582, 593, 115 Atl. 11. Finally, the admission of a question asked of McLaughlin on cross-examination, of which the defendants complained, was within the discretion of the court.

There is no error.

In this opinion the other judges concurred.