## STATE OF CONNECTICUT *v.* MARTIN CONDE
## (AC 21406)

Lavery, C. J., and Mihalakos and Shea, Js.

Argued October 15—officially released December 25, 2001

*Kent Drager*, senior assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin Lipsky*, assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Martin Conde, appeals from the judgment of conviction, rendered after a jury trial, of murder as an accessory in violation of General Statutes §§ 53a-54a[1] and 53a-8,[2] and conspiracy to com-

---

[1] General Statutes § 53a-54a (a) provides in relevant part that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-8 (a) provides that "[a] person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

mit murder in violation of General Statutes §§ 53a-54a and 53a-48.[3] The defendant claims on appeal that (1) the trial court improperly charged the jury on accessory liability, (2) the evidence adduced at trial was insufficient to support his conviction of murder as an accessory, (3) the evidence adduced at trial was insufficient to support his conviction of conspiracy to commit murder, (4) the court improperly (a) declined to admit a witness' earlier testimony as a prior inconsistent statement and (b) responded incompletely to the jury's request to see a portion of the trial transcript, (5) he was deprived of a fair trial due to prosecutorial misconduct during closing argument and (6) the court improperly instructed the jury regarding his choice not to testify. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Late in the evening on February 15, 1996, the victim, Anthony DeJesus, also known as "Dejon," was standing in his former mother-in-law's kitchen at 40 East Clay Street in Waterbury, when he was gunned down in a hail of bullets fired into the house from points outside. DeJesus was hit by five bullets and was killed by one that pierced his lung. A witness who lived across the street saw three men, who appeared to be Caucasian or Hispanic, running from the crime scene. It later was determined that three different firearms were used in the killing.

DeJesus, at the time of his death, was a member of the Waterbury chapter of the Nietas, a gang with roots in Puerto Rico's prison system. The defendant at that time was the local president of the Nietas. DeJesus had worked for the defendant selling drugs.

---

[3] General Statutes § 53a-48 (a) provides that "[a] person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

DeJesus formerly had been a member of the local chapter of the Latin Kings, a larger gang whose members tended to be younger than those of the Nietas. Both gangs operated in the south end of Waterbury and made money selling drugs. The relationship between the two gangs was cooperative rather than antagonistic; at some time prior to the events in question, they had entered into a peace treaty.

About one and one-half weeks prior to DeJesus' killing, several members of the two gangs met at the defendant's home to discuss DeJesus. At the meeting, a conversation took place between the defendant and two high ranking members of the Latin Kings. Those members were Ricky Lespier (Ricky), the president of the Meriden chapter, and Jose Dupree (Red), the Waterbury regional commander.[4] Ricky and Red expressed anger to the defendant regarding a recent incident in which DeJesus had disrespected Red by going to Red's home and threatening him with a gun in front of his family. Ricky told the defendant that he wanted something done because he believed that DeJesus' actions were wrong. The defendant also expressed anger at DeJesus because DeJesus owed him money.[5] The defendant said he wanted DeJesus dead, and told Ricky and Red to "[g]o ahead and kill him."

In an information dated March 21, 1997, the defendant was charged with conspiracy to commit murder and murder as an accessory, and was tried before a jury in 1999. Several witnesses testified for the prosecution, including Julio Lugo and Enrique Adorno. Lugo was a member of the Bristol area Latin Kings who had attended the meeting at the defendant's home and heard the entire conversation between the defendant, Ricky

---

[4] Waterbury regional commander is a higher ranking office than Meriden president.

[5] In September, 1995, the defendant loaned DeJesus $3500 so that DeJesus could post bond for his brother.

and Red. He also was visited on the night of DeJesus' murder by three Latin Kings members who rushed into Lugo's home and told him that they "did Dejon."[6]

Adorno, a former member of the Nietas, knew both the defendant and DeJesus for several years. Adorno was associated with the Nietas for eight years, and his position within the gang was "president of discipline." He testified that that meant that "if something goes wrong with one of the family members, [he would] take care of it." Adorno at one point had sold drugs and collected money, approximately $10,000 weekly, for the defendant. Sometime in the winter of 1996, prior to DeJesus' death, Adorno witnessed the defendant and DeJesus arguing over money, apparently because DeJesus had been selling drugs independently. The defendant told DeJesus that he was tired of waiting for his money. At a party subsequent to DeJesus' murder, the defendant confided in Adorno that he had been involved in the murder and, specifically, that "[he] . . . and this Latin King guy Red said to do Dejon."

At the close of the state's evidence, the defendant made an oral motion for a judgment of acquittal on both counts, which was denied by the court. The defense rested without presenting any evidence, then renewed that motion, which was again denied. The jury thereafter returned a verdict of guilty as to each crime, and the court rendered a judgment of conviction. Additional facts will be set forth where necessary to address the issues on appeal.

---

[6] Lugo, Julio Rodriguez and Brandon Rivera also were arrested in connection with the killing. Lugo initially identified only Rodriguez and George Sierra as the men who visited his home on the night of DeJesus' murder. He later named Rivera as well. Rodriguez was convicted of murder as an accessory, and that conviction since has been affirmed. *State* v. *Rodriguez*, 56 Conn. App. 117, 741 A.2d 326 (1999), cert. denied, 252 Conn. 926, 746 A.2d 791 (2000). The record is silent as to the disposition of the charges against Sierra and as to whether Rivera was arrested.

## I

The defendant claims first that the court's charge to the jury on accessorial liability was improper. Specifically, he argues that the court improperly conveyed to the jurors that they could find him guilty as an accessory to murder on the basis of his "nonactions," without instructing further that nonaction could be the basis of a conviction only if the defendant had a legal duty to act. The defendant claims that the court's "misleading and legally erroneous instructions" mandate that he be afforded a new trial on the murder as an accessory charge. We disagree.

The defendant took exception to the charge as given and, therefore, preserved his claim for our review. See Practice Book § 42-16; *State* v. *Faria*, 254 Conn. 613, 632, 758 A.2d 348 (2000). "The standard of review for an improper instruction on an element of an offense is whether it is reasonably possible that the jury was misled. *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995); *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994). In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. *State* v. *Estep*, 186 Conn. 648, 651–52, 443 A.2d 483 (1982). . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Reed*, 174 Conn. 287, 305, 386 A.2d 243 (1978) . . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. *State* v. *Roy*, 173 Conn. 35, 40, 376 A.2d 391 (1977) . . . . The charge must be considered from the standpoint of its effect on the jury in guiding [it] to a proper verdict."

(Internal quotation marks omitted.) *State* v. *Gayle*, 64 Conn. App. 596, 605, 781 A.2d 383, cert. denied, 258 Conn. 920, 782 A.2d 1248 (2001).

The court charged the jury regarding accomplice liability as to murder as follows: "A person is guilty of the crime of murder either because he is the principal offender under our law, the shooter, or because he is an accessory. I read you the murder statute because under our law, being an accessory is not a crime in and of itself. It is only another way of committing the crime, in this case, murder.

"The criminal responsibility of an accessory is provided by our statutes as follows: A person acting with the mental state required for the commission of an offense, murder, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct, and may be prosecuted and punished as if he were the principal offender.

"I emphasize to you that this statute does not connect those five acts I just mentioned with the word 'and,' but separates them by the word 'or.' A person is an accessory if he solicits or requests or commands or importunes or intentionally aids another person to engage in conduct that constitutes an offense. Solicit means to order or direct. Importune means to demand or urge. Aid means to assist. And in the course of the definition of assisting, you may take into account the broad range of actions *or nonactions* which are or may not be assistance in this particular fact pattern. It is for you to decide based upon the facts in this case whether or not under that definition of assistance would be applicable. Assistance also means help or support.

"A person acts intentionally with respect to a result or to conduct when their conscious objective is to cause such a result or to engage in such conduct. Intentionally

aid, therefore, means to act in any manner the conscious objective of which is to assist, help or support.

"In order to be an accessory under that statute, ladies and gentlemen, a person must not only solicit or request or command or importune or intentionally aid another person to engage in conduct that constitutes an offense, but he must also commit one of those five acts specified with the same mental state required for the actual commission of the underlying crime and share the same unlawful purpose or purposes in common with the person who actually commits that crime. It is not enough that a person commits acts specified in this statute that, in fact, aided the actual perpetrator of the crime. He must also have had the same mental state and purpose necessary to be guilty of the crime as does the actual perpetrator.

"In order to prove this defendant guilty as an accessory to the crime charged of murder, the state has the burden of proof that the defendant had the requisite mental state to have solicited, requested, commanded, importuned or intentionally aided another person who actually committed the crime charged, that of murder." (Emphasis added.)

The court, therefore, began its charge by relaying to the jurors an accurate definition of accessory liability through its verbatim reading of § 53a-8 (a). It explained, correctly, that a person is guilty of a crime as an accessory if, while possessing the requisite mental state, that person commits any of the five acts delineated in § 53a-8. The court gave the jury specific and proper definitions for each of those acts and elaborated on the mental state requirement.

The defendant does not take issue with the charge overall but focuses on one word only. In so doing, he asks us to disregard our standard of review and to engage in critical dissection of a jury instruction. See

*State* v. *Estep*, supra, 186 Conn. 651–52. That we cannot do, as we are bound to consider the charge as a whole. *State* v. *Reed*, supra, 174 Conn. 305. Nonetheless, even if we were inclined to consider the effect of the word "nonactions" in artificial isolation, we would conclude that the charge was proper. As more fully discussed in part II, we agree with the court that under certain circumstances, a person may "intentionally aid" in the commission of an offense within the meaning of the accessory statute through both his actions and nonactions, wholly independent of any legal duty to act.

Because the court's charge to the jury was fully accurate, legally correct and well tailored to the circumstances of this case, it is not reasonably possible that the jury was misled such that it improperly convicted the defendant of murder as an accessory. The defendant's claim of error in the instruction is, therefore, unfounded.

II

The defendant claims next that the evidence adduced at trial was insufficient to prove, beyond a reasonable doubt, that he was guilty of murder as an accessory. The defendant argues that there was insufficient evidence to show that he intentionally aided the killers of DeJesus or that he intended that DeJesus be killed. We disagree.

"The two-pronged test for determining whether evidence is sufficient to support a conviction is well established. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993)." (Internal quotation marks omitted.) *State* v.

*McClendon*, 56 Conn. App. 500, 504, 743 A.2d 1154 (2000).

"The question on appeal is not whether we believe that the evidence established guilt beyond a reasonable doubt, but rather whether, after viewing the evidence in the light most favorable to sustaining the judgment, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . While the jury may not speculate to reach a conclusion of guilt, [it] may draw reasonable, logical inferences from the facts proven to reach a verdict. . . . Deference is given to the trier of fact who had the opportunity to observe the conduct, demeanor and attitude of the trial witnesses and to assess their credibility. . . . Where there is sufficient evidence to support a reasonable inference that the defendant intended to commit the crime charged, whether such an inference should be drawn is properly a question for the jury to decide. . . .

"In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) Id., 504–505.

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in com-

bination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citation omitted.) *State* v. *Pinnock*, 220 Conn. 765, 771, 601 A.2d 521 (1992).

"Since under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] committed the [crime] charged or did some act which forms . . . a part thereof, or directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the [conviction] must stand." (Internal quotation marks omitted.) *State* v. *Fuller*, 58 Conn. App. 567, 574, 754 A.2d 207, cert. denied, 254 Conn. 918, 759 A.2d 1026 (2000).

"To justify a conviction as an accessory, the state must prove both that the defendant had the intent to aid the principal and that, in so aiding, he had the intent to commit the crime. . . . Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the [principal] must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and willingly assists the perpetrator of the offense in the acts which prepare for, facilitate, or consummate it." (Internal quotation marks omitted.) *State* v. *McClendon*, supra, 56 Conn. App. 505.

After a careful review of the record, we conclude that there was sufficient evidence presented such that the jury reasonably could have found that the defendant intended to aid the Latin Kings and that he intended that DeJesus be killed. Regarding the element of intentional aid, the defendant's claim that accessory liability may not be based on nonaction where there was no duty to act completely misrepresents the state's theory

of the case, the theory pursuant to which he was convicted. In addition, we reject the defendant's argument that passive behavior can never be the basis of a finding of accessory liability, particularly where that behavior is accompanied by a communicated assurance of passivity. Regarding the element of intent that DeJesus' death be caused, the defendant's claim that there was no evidence that his conscious objective was that DeJesus be killed is unavailing because there was ample evidence of such intent.

The defendant's claim of insufficiency of the evidence rests on an inaccurate premise. He characterizes his participation in DeJesus' murder as merely declining to protect the victim and argues the general legal principle that one cannot be held criminally responsible for failure to act where there is no duty to act. See *State* v. *Miranda*, 245 Conn. 209, 214–17, 715 A.2d 680 (1998). The idea that one may be guilty as an accessory for failing to fulfill his duty to act is a recognized theory of accessory liability, although it is not one explicitly contemplated by Connecticut's accessory statute.[7] More importantly, it is not the theory that the state presented at the defendant's trial. The state argued instead that the defendant's preapproval of the murder was an assurance that the Nietas would not retaliate if DeJesus were killed and, thus, was a form of "intentional aid" within the meaning of § 53a-8. It is of no

---

[7] 1 American Law Institute, Model Penal Code and Commentaries (1985) § 2.06 (3) (a), p. 296, provides that "[a] person is an accomplice of another person in the commission of the offense if:

"(a) with the purpose of promoting or facilitating the commission of the offense, he

"(i) solicits such other person to commit it, or

"(ii) aids or agrees or attempts to aid such other person in planning or committing it, or

"(iii) *having a legal duty to prevent the commission of the offense, fails to make proper effort so to do* . . . ." (Emphasis added.)

Connecticut's accessory liability statute encompasses the behaviors contemplated by § 2.06 (3) (a) (i) and (ii), but not subsection (iii). See footnote 2.

consequence, therefore, that the defendant was under no duty to protect DeJesus.

We turn then, to the proper issue for our review, which is whether nonaction ever may amount to "intentional aid" within the meaning of § 53a-8. Although our courts have consistently held that one cannot be liable as an accessory on the basis of his "mere presence" at a crime scene or "passive acquiescence" to the commission of a crime, the case law nonetheless establishes that passive behaviors engaged in with the intent to facilitate the commission of a crime are sufficient to support a finding of accessory liability. In a case in which a jury instruction on accessory liability was challenged as improper, our Supreme Court explicitly rejected the notion of the claim that one must engage in *active* behavior that aided the commission of an offense to be guilty as an accessory. *State* v. *Thomas*, 105 Conn. 757, 763, 136 A. 475 (1927), overruled on other grounds, *State* v. *Monte*, 131 Conn. 134, 137, 38 A.2d 434 (1944). The court held that "[o]ne may be an accessory even though he be not present 'actively aiding and abetting,' *or of being guilty of 'a positive act' in the commission of an offense*" and that "directly *or indirectly* counsel[ing]" the perpetrator may be sufficient. (Emphasis added.) *State* v. *Thomas*, supra, 763; see also 22 C.J.S. 173, Criminal Law § 139 (1989) (one may be liable as accessory when his counsel and advice influenced perpetration of crime).

Other cases have held that passive behaviors intended to facilitate the commission of a crime exposed the actor to accessory liability. See, e.g., *State* v. *Fuller*, supra, 58 Conn. App. 575 (defendant aided perpetrator by accompanying him during assault, murder and failing to summon medical assistance for victim). In a case with a similar dynamic to the one at hand, the Maine Supreme Judicial Court held that a wife's statement, " 'I won't give you any problem,' "

spoken to her husband when she learned that he planned to kill her mother, was an "assurance of non-interference" that "went beyond mere condonation or passive acquiescence" such that the wife was responsible as an accomplice for her mother's murder. *State* v. *Doody*, 434 A.2d 523, 529–30 (Me. 1981). Common to all of those cases was the coupling of passive behavior with an intent that the crime at issue occur.

In light of the parameters of accessory liability previously outlined, we conclude that the jury had before it sufficient evidence to convict the defendant of murder as an accessory. The jury heard the testimony of Waterbury police Sergeant Gary Pelosi, who explained gang hierarchy and the dynamics of gang activity in the city. Pelosi testified that the Latin Kings and the Nietas were not rival gangs, but that they coexisted peaceably while engaging in lucrative narcotics trafficking in the south end of Waterbury.

The jury also heard the testimony of Lugo, who verified the existence of the amicable relationship between the two gangs. He explained the hierarchy of the gangs, including the defendant's position as president of the Nietas, Red's position as regional commander of the Latin Kings and Ricky's position as president of the Meriden chapter of the Latin Kings. Lugo spoke of the power and authority that the president of a gang could wield, and of his ability to order beatings or killings. He testified that one of the "rules" of gangs was that they typically offered protection to their members and opined that if a member of one gang harmed, assaulted or murdered a member of a different gang, retaliation or "war" would be the result.

Lugo also described to the jury the meeting between the Latin Kings and the Nietas at the defendant's home. He testified that the Latin Kings "wanted to talk to [the defendant] about [DeJesus] disrespecting one of the

guys from the Latin Kings." He relayed to the jury the conversation that occurred at the meeting. Lugo stated how Red and Ricky expressed anger at DeJesus' disrespect of Red, and how Ricky told the defendant that "he wanted something to be done because it wasn't right." Lugo testified that the defendant responded, " 'Go ahead and kill him.' " He also testified that the defendant said at the meeting that DeJesus owed him money and that the defendant was angry and wanted DeJesus dead.

Adorno, a former member of the Nietas who had known the defendant for nine years, also testified and confirmed that the defendant was the president of that gang. He reiterated that gangs offer protection to their members and engage in retaliatory actions when members are harmed. He characterized the relationship between the Latin Kings and the Nietas as "like cousins," and testified that the two gangs had "a peace treaty" pursuant to which they offered each other assistance. He stated that the Latin Kings and the Nietas "had an agreement" whereby they both could sell drugs in the south end of Waterbury and that they made "a lot of money" doing so.

Adorno testified further that at a party that took place after DeJesus' murder, the defendant told him that he had been angry with DeJesus because DeJesus owed him a large sum of money. Adorno added that prior to DeJesus' death, he had witnessed an argument between the defendant and DeJesus over money. Adorno testified that later in the evening at the party, the defendant confided in him that "he had something to do with [DeJesus' murder]" and, specifically, that "[the defendant] . . . and this Latin King guy Red said to do Dejon."

Given that testimony, the jury had before it sufficient evidence to conclude that the defendant had facilitated

DeJesus' murder by counseling and advising the leadership of the Latin Kings that if they went ahead with the murder, no retaliatory action would be forthcoming. From the testimony regarding gang hierarchy and dynamics, and the defendant's position of power, the jury reasonably could have inferred that the Nietas would have retaliated had the Latin Kings not sought permission and approval for the killing first, and, therefore, that lack of permission and approval would have deterred them from proceeding with the killing. In assuring the Latin Kings' leadership that killing DeJesus would not disrupt the peace treaty between the gangs, cause a war and thereby disturb the lucrative drug trade that the two groups shared, the defendant provided a powerful incentive for the Latin Kings to commit the murder. The evidence was sufficient to show that the defendant had provided an assurance of noninterference that went far beyond passive acquiescence or mere condonation, and the jury, therefore, properly could find beyond a reasonable doubt that he intentionally aided in the commission of DeJesus' murder.

Furthermore, the testimony regarding the defendant's statement at the meeting, "Go ahead and kill him," his subsequent admission to Adorno that "[he] . . . and . . . Red said to do Dejon," and his anger at DeJesus for debts due were sufficient to support the jury's finding that the defendant intended DeJesus' death. See *State* v. *Fuller*, supra, 58 Conn. App. 575 (perpetrator's and defendant's shared "interest in the punishment of the victim" factor supporting defendant's conviction as accessory). We conclude, on the basis of the evidence presented, that the jury reasonably could have found, beyond a reasonable doubt, that the defendant was guilty of murder as an accessory.

### III

The defendant next claims that the evidence adduced at trial was insufficient to prove, beyond a reasonable

doubt, that he was guilty of conspiracy to commit murder. The defendant argues specifically that there was insufficient evidence to show that he intentionally agreed that DeJesus should be killed or that he intended DeJesus' death. We disagree.[8]

We reiterate briefly our standard of review of a sufficiency of the evidence claim. We first construe the evidence most favorably to upholding the defendant's conviction, then ask whether a jury, upon the facts so construed and the reasonable inferences that follow, could have found the elements of conspiracy to commit murder proven beyond a reasonable doubt. *State* v. *McClendon*, supra, 56 Conn. App. 504. In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference. Id., 504–505.

"To establish the crime of conspiracy under § 53a-48 of the General Statutes, it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . To prove the offense of conspiracy to commit murder, the state must prove two distinct elements of intent: that the conspirators intended to agree; and that they intended to cause the death of another person." (Citation omitted; internal quotation marks omitted.) *State* v. *Pinnock*, supra, 220 Conn. 771.

To convict the defendant of the offense as charged in this case, therefore, the jury had to find that (1) the

---

[8] Because we concluded in part II that there was sufficient evidence to support the jury's finding that the defendant intended DeJesus' death, we confine our discussion in part III to a consideration of whether there was sufficient evidence to support the jury's finding that the defendant agreed that DeJesus should be killed.

defendant and members of the Latin Kings intentionally agreed to cause DeJesus' death, (2) at the time of the agreement, the defendant intended that DeJesus' death be caused, and (3) the defendant or members of the Latin Kings committed an overt act in furtherance of the conspiracy by shooting and killing DeJesus. See id., 771–72.

"While the state must prove an agreement, the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose." (Internal quotation marks omitted.) Id., 772. "[T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 245–46, 690 A.2d 1370 (1997).

Furthermore, "[i]ntent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . [I]ntent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Henry*, 253 Conn. 354, 367, 752 A.2d 40 (2000). "In a conspiracy prosecution, when determining both a defendant's specific intent to agree and his specific intent that the criminal acts be performed, the jury may rely on reasonable inferences from facts in the evidence and may develop a chain of inferences, each link of which may depend for its validity on the validity of the prior link in the chain." (Internal quotation marks omitted.) *State* v. *Bond*, 49 Conn. App. 183, 196, 713 A.2d 906, cert. denied, 247 Conn. 915, 722 A.2d 808 (1998).

The jury in this case heard evidence that the defendant was upset with DeJesus because DeJesus owed him money and was selling drugs independently. Lugo testified that the defendant, who was the president of the Nietas, had met cordially with members of the Latin Kings, specifically, both its local and regional leadership, and discussed what should be done to DeJesus because of his disrespect toward Red. Lugo testified further that the defendant said to " '[g]o ahead and kill [DeJesus].' " Shortly thereafter, DeJesus was killed by members of the Latin Kings. Adorno testified that the defendant subsequently confided in him that "[the defendant and] Red said to do Dejon." In response to the prosecutor's hypothetical question regarding intergang dynamics, Adorno also testified that if another gang member harmed or did something to a Nietas member, "[t]he presidents would get together from both families and have a meeting, and decide how they [were] going to take care of the situation."

Given the various testimony presented regarding the tone and timing of the conversation at the meeting, the hierarchy of power within the Latin Kings and the Nietas, the friendly and cooperative relationship between the two gangs, and the potential consequences of the breakdown thereof, and the gangs' general operating procedures regarding discipline, the jury reasonably could have inferred from the evidence that Red, Ricky and the defendant, in light of their common concerns, met to confer about the fate of DeJesus and together reached an agreement that he should be killed.

The defendant argues that the evidence established that he merely acquiesced to DeJesus' murder and did not intend to agree that it should occur. "In considering whether the evidence fairly supports a jury's finding of guilt, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a

reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 542, 679 A.2d 902 (1996). Because there was substantial evidence to support the jury's conclusion that the defendant intentionally agreed with members of the Latin Kings that DeJesus should be killed, the defendant's claim of insufficient evidence to support his conspiracy conviction is without merit.

## IV

The defendant in his next two claims contests the court's ruling on the admissibility of evidence and the court's provision of a portion of the trial transcript to the jury.

### A

The defendant claims that the court improperly declined to admit as either impeachment or substantive[9] evidence the transcript of Lugo's testimony at the defendant's hearing in probable cause. We disagree.

At both the defendant's hearing in probable cause and during the defendant's trial, Lugo testified for the prosecution about the meeting between the defendant and members of the Latin Kings, and about the surrounding circumstances. At trial, Lugo testified on cross-examination, inter alia, that the Latin Kings did not decide whether to kill DeJesus prior to the meeting with the defendant and that the plan to kill DeJesus was formulated at that meeting.[10] Defense counsel

---

[9] Pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), a prior inconsistent statement may be used during trial for substantive purposes if the statement is signed by the declarant, who has personal knowledge of the facts stated therein, and who testifies at trial and is subject to cross-examination.

[10] The relevant portions of Lugo's testimony at trial are as follows:

"[Defense Counsel:] And you've said in your prior testimony, and I take it [that] it's still your opinion, that the reason that the Latin Kings went to see [the defendant] at this meeting that you talk about is because they wanted to tell him what they had already planned to do, that is, to kill

attempted to impeach Lugo by asking him questions regarding his testimony at the hearing in probable cause and having him read the transcript of that hearing. Thereafter, defense counsel sought to have selected pages of the transcript admitted into evidence as a prior inconsistent statement. The court, after reviewing the transcript and hearing argument on the matter, refused to allow Lugo's hearing testimony into evidence because it did not find that testimony to be inconsistent with Lugo's trial testimony. The defendant now claims that this ruling was improper.

"A statement is admissible as a prior inconsistent statement . . . only when the trial court is persuaded that, taking the testimony of the witness as a whole, the statements are in fact inconsistent. . . . Such a

Anthony DeJesus, also known as Dejon?

"[Prosecutor]: Objection. That's not what he testified to.

"[Defense Counsel:] I didn't say he testified to it here. I'm asking him the question now, whether or not the Latin Kings had already decided to do this killing before they had this meeting with [the defendant].

"[Witness]: No.

"[Defense Counsel:] Well, you testified to that in the past, have you not?

"[Witness]: I don't think so.

\* \* \*

"[Defense Counsel:] Did you know at the time you went to the meeting that the plan had already been hatched to kill Anthony DeJesus—when is the first time you found out about that killing or the intention to kill him?

"[Witness]: At the meeting.

"[Defense Counsel:] All right. Now you're saying that's the first you heard of it?

"[Witness]: Yes.

\* \* \*

"[Defense Counsel:] Mr. Lugo, you had indicated in your prior testimony here this morning that according to your recollection now, that this plan to do something to Dejon was first hatched, if you will, up at this meeting that you were present at; is that your testimony today?

"[Witness]: I don't understand what—

"[Defense Counsel:] I'm asking you—you're saying—I think you indicated in response to a question earlier that the plan, as far as you know, was formed, the plan to hurt Dejon or kill Dejon, was formed in that apartment at this meeting you claim that you attended?

"[Witness]: Yes."

determination as to inconsistency lies within the discretionary authority of the trial court. . . . [T]he trial court's ruling on the admissibility of evidence is entitled to great deference and will be overturned only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Valentine*, 255 Conn. 61, 76, 762 A.2d 1278 (2000). In reviewing a court's discretionary evidentiary rulings, we make every reasonable presumption in favor of upholding those rulings. *State* v. *Orhan*, 52 Conn. App. 231, 237, 726 A.2d 629 (1999).

"In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . ." (Internal quotation marks omitted.) *State* v. *Portee*, 55 Conn. App. 544, 556, 740 A.2d 868 (1999), cert. denied, 252 Conn. 920, 744 A.2d 439 (2000), quoting *State* v. *Whelan*, 200 Conn. 743, 748–49 n.4, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); see also *State* v. *Bova*, supra, 240 Conn. 227.

During cross-examination at the hearing in probable cause, defense counsel repeatedly tried to get Lugo to admit that the Latin Kings had formed a plan to kill DeJesus prior to their meeting with the defendant.[11] A brief portion of Lugo's response, viewed in isolation and construed particularly, would seem to contradict his testimony at trial. Viewing Lugo's entire hearing testimony with the aim of sustaining the court's ruling, however, we cannot say that the whole impression thereof supports the proposition that he testified as to

---

[11] The same counsel represented the defendant at the hearing in probable cause and at trial.

a preexisting plan. Lugo's hearing testimony, therefore, was not inconsistent with his trial testimony such that the court improperly disallowed its admission.

It is true that at one point in the hearing, Lugo responded, "Yeah," to defense counsel's pointed query, "And it was decided, in fact, to the best of your knowledge before they even went to [the defendant's] house, that they were going to do something about this, they were going to take care of Dejon; is that right?" Lugo, however, immediately qualified his affirmative response with, "But they wanted to talk to him first." Lugo, in subsequent portions of his hearing testimony, indicated that the Latin Kings had met with the defendant to seek his permission, approval or advice on how to deal with DeJesus, not merely to apprise him of what they already had decided to do.[12] In addition, as the

---

[12] The portion of Lugo's hearing testimony that defense counsel sought to have admitted into evidence at trial is as follows:

"[Defense Counsel:] And it was decided, in fact, to the best of your knowledge before they even went to [the defendant's] house, that they were going to do something about this, they were going to take care of Dejon; is that right?

"[Witness]: Yeah. But they wanted to talk to him first.

"[Defense Counsel:] Right. But they wanted to talk to [the defendant], would it be a fair statement, they wanted to talk to [the defendant] because they wanted to make sure that if they did something to Dejon, this wasn't going to result in some kind of gang war or turf war in retribution for what they were planning to do to him?

"[Witness]: Yes.

"[Defense Counsel:] They went, in essence, to tell [the defendant] what it was they were planning to do and to make sure that this was not going to result in any retaliation by [the defendant] against them; isn't that a fair statement?

"[Witness]: No. It was actually like asking for permission.

"[Defense Counsel:] Well—

"[Witness]: To—

"[Defense Counsel:] Well, it was the Latin Kings who were offended by Dejon's actions; correct?

"[Witness]: Yes.

"[Defense Counsel:] And the Latin Kings had already decided that they were going to get Dejon?

"[Witness]: Mm-hmm.

court pointed out, the phrasing of defense counsel's question that drew the affirmative response was ambiguous. Thus, when Lugo agreed that the Latin Kings were "going to do something about this" or "take care of Dejon," it was unclear that he was describing a preexisting plan to kill DeJesus.

Our review of Lugo's trial testimony and his testimony at the hearing in probable cause convinces us that the court did not abuse its discretion when it ruled that the hearing testimony was not inconsistent with the trial testimony and, therefore, that it was inadmissible.[13]

"[Defense Counsel:] And isn't it your understanding from your presence and participation at that meeting that they were simply informing [the defendant] of what they were going to do in order to make sure that he won't be offended enough by it to retaliate against them?

"[Witness]: They were—they was asking him.

"[Defense Counsel:] Right.

"[Witness]: They were asking him.

"[Defense Counsel:] They were asking him whether or not there was going to be a war?

"[Witness]: No.

"[Defense Counsel:] If they went ahead and carried out their plan to kill Dejon—?

"[Witness]: They asked him what he wants us to do about it. . . .

"[Defense Counsel:] Well, you tell me if I'm wrong. Didn't you in your previous testimony [at a codefendant's trial], didn't you indicate that the reason that they went to plan this meeting with [the defendant] was to inform him of what they had planned to do to Dejon?

"[Witness]: Well, they had a meeting because he was—Dejon was hanging with them.

"[Defense Counsel:] Right.

"[Witness]: With the Nietas. So they had to talk to him first.

"[Defense Counsel:] Okay. I understand that. So, in other words—well, wasn't it—you correct me if I'm wrong. Didn't they go there to make sure that [the defendant] would not retaliate against them if they went and killed Dejon?

"[Witness]: They wanted to see—they wanted to see what he had to say.

"[Defense Counsel:] Right. What his reaction would be?

"[Witness]: What he wanted to say.

"[Defense Counsel:] About what they told him about their plan; correct?

"[Witness]: Yes."

[13] We note additionally that the defendant has not shown that the court's evidentiary ruling resulted in substantial prejudice or injustice. For one to

## B

The defendant also claims that the court, in responding to the jury's request during deliberation to see a portion of the trial transcript, provided an incomplete selection that did not contain all of the relevant testimony. We are not convinced.

The following additional facts are relevant to this issue. During deliberation, the jury sent a note to the court requesting that it be provided with excerpts from the trial transcript. Specifically, the note read, "Need to see Lugo's testimony where Conde said kill him." In response, the court reviewed the transcript for all references to the requested subject matter and provided the jury with copies after redacting the portions that did not pertain to the request. The jury accepted the transcripts and did not request any further portions thereof. The defendant claims that the court should have provided the jury with additional material. He argues specifically that the court should have included the portions of Lugo's testimony where defense counsel attempted to elicit from the witness a statement that the plan to kill DeJesus was formed prior to the meeting between the Latin Kings and the defendant.

be held liable as an accessory, "[i]t is not necessary that he shall be the originator of the design to commit the crime but, rather, it is sufficient if, with knowledge that another intends to commit a crime, he encourages and incites him to carry out his design." 22 C.J.S. 173, supra, § 139. Regarding conspiracy, "[t]he agreement need not be entered into by all the parties to it at the same time, but may be reached by successive actions evidencing their joining of the conspiracy." 16 Am. Jur. 2d 206, Conspiracy § 10 (1998). "One who comes into a conspiracy after it has been formed, with knowledge of its existence and with a purpose of forwarding its designs, is as guilty as though he had participated in its original formation." *State* v. *McLaughlin*, 132 Conn. 325, 333, 44 A.2d 116 (1945). Therefore, even if the defendant was able to establish that the Latin Kings had formed a plan to kill DeJesus prior to the meeting at the defendant's home, it would not have precluded the jury from finding that the defendant subsequently joined or assisted in that plan.

"The trial court has discretion to grant a jury's request to review testimony. . . . What portions of the record, if any, will be submitted to the jury for [its] consideration is a matter of sound judicial discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Harris*, 227 Conn. 751, 770, 631 A.2d 309 (1993); see Practice Book § 42-26.

In this case, the court provided the jury with the portions of Lugo's testimony that it requested and did not provide it with portions that it did not request. After receiving the transcripts, the jury did not complain that the parts it sought were omitted, and it did not request additional portions. The testimony that the defendant claims should have been included involves subject matter not contemplated by the words of the jury's request. Under those circumstances, we conclude that the court did not abuse its discretion and, therefore, find no error in its action.

V

The defendant next claims that he was deprived of a fair trial because of prosecutorial misconduct during closing argument. Specifically, he argues that the prosecutor improperly made comments that referred to facts that were not in evidence, and that such references were "so egregious and prejudicial that a new trial is required." We disagree.

The defendant concedes that he did not raise his claim of error at trial and now seeks review under the standard of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[14] We review the defendant's claim

---

[14] Pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable

because the record is adequate and because a claim that the defendant was deprived of a fair trial is of constitutional magnitude. *State* v. *Radzvilowicz*, 47 Conn. App. 1, 44, 703 A.2d 767, cert. denied, 243 Conn. 955, 704 A.2d 806 (1997).

During trial, evidence was presented that established that three different shooters were involved in the murder of DeJesus. Thereafter, the state attempted to introduce hearsay testimony indicating that one of the shooters was a member of the Nietas. Specifically, the state tried to introduce a statement purportedly made by Julio Rodriguez, who also was arrested in connection with the killing, when he arrived at Lugo's home shortly after DeJesus' murder. The court ruled that the testimony was inadmissible. The defendant claims that in closing argument, the prosecutor, in several instances, improperly alluded to and relied on the hearsay testimony that was not introduced into evidence.

Prosecutorial misconduct may occur during closing argument. *State* v. *Whipper*, 258 Conn. 229, 262, 780 A.2d 53 (2001). "In analyzing claims of prosecutorial misconduct, however, we ask whether the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . The standard that we follow in analyzing constitutional due process claims that allege prosecutorial misconduct is the fairness of the trial rather than the culpability of the prosecutor's conduct. . . .

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, [courts have] focused on several factors. . . . Included

doubt." (Emphasis in original.) "The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial. . . . This court may dispose of the claim on any one of the conditions that the defendant does not meet." (Internal quotation marks omitted.) *State* v. *Jones*, 65 Conn. App. 649, 653, 783 A.2d 511 (2001).

among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) Id., 262–63.

"[I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Moore*, 49 Conn. App. 13, 28, 713 A.2d 859 (1998). However, "in fulfilling his duties, the prosecutor must confine the arguments to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony that is not the subject of proper closing argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Whipper*, supra, 258 Conn. 263.

The defendant claims first that the prosecutor improperly alluded to facts not in evidence when she argued to the jury that "[i]t's just as important what was told to you here as what was not told to you, what witnesses refused to tell you." Our review of the transcript reveals that the prosecutor, in making that remark, was concluding her explanation of the difficulty of getting witnesses to testify in crimes involving gang violence and was in no way commenting on facts outside of the evidence. In prefacing those remarks, the prosecutor referenced defense counsel's argument that "the entire state of the evidence in this case . . . [came] from two snitch witnesses." The prosecutor's

remark, therefore, was a proper response to the defense comment.

The defendant next claims that the prosecutor improperly suggested that the jury could infer that the defendant had called the meeting between the Latin Kings and the Nietas because there was no evidence that this was so. An undisputed fact in evidence was that the meeting took place at the defendant's home. It is a reasonable inference therefrom that the defendant had called the meeting. Furthermore, the defense had argued prior to the prosecutor's comment that the facts "suggest very strongly that [the defendant] didn't know that this meeting was going to take place, that he didn't call it [and] that he probably may well never had been informed in advance of the fact that this meeting was going to take place." The prosecutor's comments thus were invited by defense argument and, given that our review of the record uncovers no specific testimony regarding who called the meeting or any evidence whatsoever suggesting that the defendant was surprised by it, we cannot say that the inference suggested by the prosecutor was improper while those suggested by the defense were not.

The defendant claims also that the prosecutor engaged in misconduct when she argued that the defendant possessed power and authority, and could issue orders that others would follow. Insofar as those points were attested to by both Lugo and Adorno during trial, and the state's theory of the case was that the defendant had assisted in killing DeJesus by ordering the Nietas not to retaliate, we have difficulty concluding that those remarks were improper.[15]

The defendant further claims error in the prosecutor's comment on the various actions of the defendant that

---

[15] The defendant's suggestion that those general remarks improperly suggested, contrary to the evidence, that he had the authority to issue orders directly to members of the Latin Kings, is unfounded.

could qualify as intentional aid to support the accessory charge. Specifically, the prosecutor stated that aid could be "any one of those things, the fact that he agrees not to retaliate, the fact he says kill him and participates in that decision, the fact he holds the meeting, the fact he tells his people what's going on, *the fact that he possibly, you can infer from the evidence, then does have people go because we don't know who all those shooters are. . . .*" (Emphasis added.) The defendant argues that the last part of the prosecutor's comment improperly alluded to her knowledge of the inadmissible hearsay statement that suggested that a Nietas member was one of DeJesus' actual killers. We agree with the defendant that in making that remark, the prosecutor was alluding to evidence outside the record. We reject, however, that this vague and isolated remark so infected the entire proceedings with unfairness such that a new trial is warranted.

The defendant claims last that the prosecutor improperly characterized him as a Marlon Brando, "Godfather" type figure who had the power to decide whether others should be killed. We note again that there was ample evidence submitted at trial regarding the defendant's position at the top of the Nietas power structure, and the disciplinary and protective functions of gangs. We therefore conclude that the prosecutor's comments properly conveyed to the jury the state's theory, based on the evidence, that the defendant was in a position to decide whether or not retribution would occur if the Latin Kings killed DeJesus and thus to facilitate that killing by assuring that retribution would not occur.

The comments of the prosecutor to which the defendant now objects were, in large part, not inappropriate. Any improper argument was isolated and ambiguous. We conclude that when the prosecutor's remarks are viewed in the context of the entire trial, they did not cause unfairness such that the defendant's conviction

resulted from a denial of due process. The defendant has not satisfied the third prong of *Golding* by showing that a constitutional violation clearly existed and clearly deprived him of a fair trial, and, consequently, his claim of prosecutorial misconduct fails.

## VI

The defendant's last claim is that the court improperly instructed the jury on his choice not to testify at trial. He argues that the court's use of the phrase "failure to testify" was reversible error. We disagree.

Regarding the fact that the defendant did not testify at trial, the court instructed the jury as follows. "The defendant has not testified in this case. An accused person has the option to testify or not to testify at trial. He is under no obligation to testify. He has a constitutional right not to testify, and you must not draw any unfavorable inferences from the defendant's *failure to testify*." (Emphasis added.)

The defendant in his reply brief concedes that our resolution of his claim is controlled by the recent decision of our Supreme Court in *State* v. *Casanova*, 255 Conn. 581, 767 A.2d 1189 (2001). In *Casanova*, the court rejected the defendant's claim that the phrase "failure to testify," in the context of a charge virtually identical to the one given in this case, had such a negative connotation that it amounted to reversible error. Id., 597–601. Because "[w]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them"; (internal quotation marks omitted) *State* v. *Thomas*, 62 Conn. App. 356, 364, 772 A.2d 611, cert. denied, 256 Conn. 912, 772 A.2d 1125 (2001); the defendant's claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.